## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**NASRIN FATEMI**                                                    **PLAINTIFF**

v.                                      **No. 4:11-cv-458-DPM**

**HOSEA LONG, in his official
capacity; JAMES CLARDY, in his
individual and official capacities;
DEBRA FISER, in her individual
and official capacities; JOHN DAY,
in his individual and official capacities;
and UNIVERSITY OF ARKANSAS SYSTEM**          **DEFENDANTS**


### ORDER


    **1. Background.** The Court's recent Order[1] pared the case to Dr. Fatemi's

gender-discrimination claim, the core of the case, and her retaliation claim, as

well as the University Defendants' immunity defenses.  It remains for the

Court to explain why it concludes that Dr. Fatemi's claims fail as a matter of

law.

    The case comes down to pretext and causation.   Considering the

undisputed material facts, and resolving disputed facts in Dr. Fatemi's favor,

could a reasonable fact-finder conclude that gender discrimination or

---

[1] № 184.

retaliatory animus caused the University Defendants to end Dr. Fatemi's residency? *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). No. It was poor performance. Dr. Fatemi presses hard on the UAMS neurosurgery program's lack of women graduates, her own qualifications, and how other residents were treated. All of this gets her over the low hurdle of a *prima facie* case on gender discrimination. But she has not come forward with sufficient evidence that the University Defendants' performance-based concerns were not only false, but a cloak for discrimination, to create a genuine factual dispute for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Torgerson*, 643 F.3d at 1042. So too on the alleged retaliation: Dr. Fatemi offers her post-deposition declaration and selectively emphasizes slices of the record; but she does not come forward with sufficient evidence that anything other than well-justified performance concerns motivated her being dismissed from the program. *Bacon v. Hennepin County Medical Center*, 550 F.3d 711, 716 (8th Cir. 2008).

The immunity issues merge into the merits. While Arkansas's sovereign immunity would not bar declaratory or injunctive relief in a proper case, because Dr. Fatemi's claims fail on the merits, this is not such a case. *Edelman*

*v. Jordan*, 415 U.S. 651, 663-69 (1974). On qualified immunity, no one disputes that Dr. Fatemi asserts violations of clearly established rights. The dispositive question is whether a reasonable official in the place of Dr. Day and his colleagues would have known that their actions violated Dr. Fatemi's rights. *Burnham v. Ianni*, 119 F.3d 668, 673-74 (8th Cir. 1997). Taking the record in the light most favorable to Dr. Fatemi, the Court concludes that the University Defendants did not violate her right to freedom from gender discrimination or any other asserted right.

But assuming the Court is mistaken on that score, the individual University Defendants are still entitled to qualified immunity. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Austell v. Sprenger*, 690 F.3d 929, 936 (8th Cir. 2012) (quotation ommitted). This is a demanding legal standard, especially in the public-hospital setting, where decisionmakers such as Dr. Day are entitled to much discretion in personnel matters to protect patients. *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 462-63 (4th Cir. 2012). Whether, for example, the dueling lawyer letters around the time of termination and the University Defendants' insistence that a third person be present when anyone

spoke to her crossed the retaliation line, could be seen as gray areas. But whether considered purely on the merits, or as a matter of judgment calls, qualified-immunity insulates against liability; Dr. Fatemi's case falters as a matter of law.

**2. The Record In General.** Dr. Fatemi's employment at UAMS lasted four months before the faculty determined that she had poor interpersonal skills, that her trustworthiness in dealings with the faculty and residents was in doubt, and that she consistently blamed others for her shortcomings. Before terminating Dr. Fatemi, Neurosurgery Department Chair Dr. J.D. Day put her on probation, giving her notice of specific areas in which her performance needed to improve.[2]  Dr. Day terminated Dr. Fatemi six weeks later, citing concerns for patient safety, when he concluded she was not improving.[3]

**3. Gender Discrimination.** Because Dr. Fatemi has not presented any direct evidence that the University Defendants discriminated against her based on her gender, she must establish a *prima facie* case of discrimination

---

[2] № 80-1 at 8 & 12-13.

[3] № 80-1.

under the familiar *McDonnell Douglas* framework. 411 U.S. 792, 801-04 (1973).
Dr. Fatemi must demonstrate that she is a member of a protected group, was
meeting UAMS's legitimate expectations, that she suffered an adverse
employment action, and that she suffered under circumstances permitting an
inference of discrimination. *Ibid.* Dr. Fatemi is female, and therefore a
member of a protected group. Her termination from the residency program
at UAMS was certainly an adverse employment action. The remaining two
factors are murky here. But it bears emphasis that the *prima facie* burden is
neither onerous nor the end of the case. *Lake v. Yellow Transportation, Inc.*, 596
F.3d 871, 874 (8th Cir. 2010) (quotation omitted).

First, Dr. Fatemi must show that, setting aside UAMS's reason for firing
her, she was *otherwise* meeting expectations or *otherwise* qualified. *Ibid.* Dr.
Fatemi need not disprove UAMS's reason for firing her at this stage of the
analysis. *Ibid.* She has a medical degree and was qualified enough to be
accepted to the residency program.[4] From her perspective, she experienced
discrimination on her first day at UAMS.[5] Though some performance

[4] *No. 113 at 1.*

[5] *№ 113 at 9.*

-5-

difficulties started almost immediately, the Court concludes that Dr. Fatemi has shown that she was otherwise qualified at the threshold. Early on, UAMS expected her to succeed and rightly so.

Next, Fatemi must present evidence that tends to support an inference of discrimination. No woman had graduated from this program. And Dr. Fatemi makes a showing indicating some male residents were treated, at least superficially, somewhat more favorably. At this point in the analysis, the comparator standard is on the loose side. *Lake*, 596 F.3d at 874. Because the *prima facie* burden is a procedural means, not an end; because of the inherent difficulties in proving discrimination circumstantially; and because Dr. Fatemi's intial burden is relatively light as a matter of law, *ibid.*, viewing the record from Dr. Fatemi's side as favorably as possible to her, she has carried her burden.

Under *McDonnell Douglas*, the University Defendants must therefore identify a non-discriminatory basis for firing Dr. Fatemi. They have. Dr. Day's termination letter says: "She clearly did not have skills consistent with someone who was at least a second year resident."[6] He also cited a troubling

---

[6] № 80-1 at 20.

"lack of professionalism" and said, "she has clearly not been able to demonstrate a significant enough turnaround for me to have any confidence that she will be able to have acceptable professional relations in the future. This I believe will compromise her ability to properly care for patients."[7] In response to Dr. Fatemi's later grievance, Dr. Day reiterated these concerns in a letter to Dr. Fiser.[8]

The record reveals multiple instances of Dr. Fatemi's disputative behavior and her repeated refusal to take responsibility for her problems interacting with hospital and university personnel. Dr. Pait testified that her inability to work well with other residents compromised patient care.[9] She met offers of help with hostility.[10] Her file contains multiple accounts of unprofessional demeanor and refusals to take responsibility for her behavior.[11] Others reported that Dr. Fatemi did not appear for or walked out

---

[7] *Ibid.*

[8] *№ 80-1 at 83-88.*

[9] *№ 81-3 at 61, ll. 176:21-22.*

[10] *№ 83-2 at 9.*

[11] *№ 80-1 ¶4.*

on surgeries or duties assigned to her.[12]  In the absence of any indication that those reporting these deficiencies were motivated by any discriminatory animus, *e.g. Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, (8th Cir. 2011),  her supervisors were entitled to believe that the reports from multiple people without any direct interest were true.  Dr. Day also testified that he had concerns about Dr. Fatemi's untruthfulness, based on his own dealings with her.[13]  Apart from the friction with coworkers and supervisors, the record reflects objective performance problems, some as basic as her not holding a scalpel correctly.[14]

The University Defendants have demonstrated legitimate, non-discriminatory reasons for ending Dr. Fatemi's residency.  She must therefore present sufficient evidence that those performance-based reasons were a pretext for gender discrimination. *Martinez v. Grainger, Inc.*, 664 F.3d 225, 230 (8th Cir. 2011).  That is, the Court must directly address whether Dr. Fatemi has presented an issue of material fact for trial on the ultimate question:

---

[12] *№ 82-8 at 18; № 81-3 at 3 ¶11 & № 81-3 at 16; № 83-10.*

[13] *№ 80-1 at 110-111 ll.72:22-73:3.*

[14] *№ 82-1 at 32-33; № 80-1 at 17.*

discrimination *vel non*. *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 416 (8th Cir. 2010).

To establish a genuine issue of material fact, Dr. Fatemi may not "merely point to self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in her favor." *Argenyi v. Creighton*, 703 F.3d 441, 446 (8th Cir. 2013) (quotation omitted). Her performance problems were well-documented and formed the basis for her termination.[15]     And her post-deposition declaration is not the kind of probative evidence *Argenyi* requires.   She has not presented any valid comparators to show disparate treatment.   *EEOC* v. *Kohler Co.*, 335 F.3d 766, 775-76 (8th Cir. 2003).   Nor is there evidence of bad faith on the part of the physicians Dr. Fatemi says discriminated against her.

Dr. Fatemi has produced no evidence that the actions Dr. Clardy, Dr. Day, and Dr. Fiser took, either individually or in their official capacities, involved discrimination on the basis of gender.  Her statements of fact are conclusory and argumentative; and her interpretation of events is implausible, given the rest of the record.   *Frevert v. Ford Motor Co.*, 614 F.3d

---

[15] *№ 80-1 at 20.*

466, 474 (8th Cir. 2010).   Dr. Day says he believed, based on the reports he had received from several people, that he owed a duty to UAMS's patients to remove Dr. Fatemi from the program.[16] Based on the facts of record, no reasonable juror could conclude that gender discrimination motivated Dr. Day when he put Dr. Fatemi on probation and later terminated her employment.

•   **No Valid Comparators.**  Dr. Fatemi compares herself to male employees who were not similarly situated.   *Davis v. Jefferson Hospital Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012).   At the pretext stage, Dr. Fatemi "must satisfy a more rigorous standard and show that she and the individuals used for comparison . . . dealt with the same supervisor, [were] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Ibid.; see also Fields v. Shelter Mutual Insurance Co.*, 520 F.3d 859, 864 (8th Cir. 2008).

Dr. Fatemi frequently compares herself with Dr. Tabbosha, a male resident who arrived at the same time and was one year senior in the

---

[16] № 80-1 at 8, 13 & 20.

neurosurgery program.[17] Dr. Fatemi says Tabbosha made numerous surgical mistakes and had similar interpersonal problems.[18] She says that he was treated more favorably under the same set of facts.[19] Even if what Dr. Fatemi says about her colleague's performance is true, she does not point to any evidence that Tabbosha was unwilling to accept responsibility, was dishonest, or made no efforts to improve. For example, Dr. Fatemi has not provided any evidence that Tabbosha rebuffed faculty criticism. In contrast, this record overflows with faculty members' documented concerns that Dr. Fatemi could not be trusted and blamed others for her mistakes at every turn.[20] Dr. Fatemi's apparent lack of surgical experience was accepted and understood by faculty. Their notes seem less concerned with her surgical skills than with her lack of professional demeanor.[22]

Dr. Fatemi also compares her situation to Dr. N.S., a 2004 resident who was allowed to finish his contract before he was asked to leave UAMS for

---

[17] № 113 at 48-50.

[18] № 113 at 22-24 & 48-50.

[19] Ibid.

[20] № 81-3 at 61, ll. 21-22; № 82-8 at 18; № 80-1 at 110-111, l. 72:22-73:3.

[22] № 82-1 at 33; № 82-2 at 28.

-11-

medical errors and behavioral issues.[23]  Dr. Fatemi says N.S.'s six-month

probation period shows that males with behavioral and skill issues were

treated more favorably under similar circumstances.[24]  Her probation period

was six weeks.[25]  But the record shows that Dr. Fatemi also could have

finished her contract, resigning at the end of her term at UAMS.[26]  The only

explanation for this difference in treatment that is supported by the record is

Dr. Fatemi's continued violation of the terms of her probation and refusal to

resign. She gave Dr. Day no choice but to terminate her.

Dr. Fatemi brings up a number of other doctors in her brief's factual

background section but does not directly argue that she was treated

differently from them.  The Court will nonetheless consider, briefly, the

validity of these potential comparators.  Drs. B.Y., B.E., and N.S. are not

comparators because the incidents Dr. Fatemi cites occurred before Dr. Day

chaired the Department.  They all had, in a word, a different ultimate

--------------------------------------------------

[23] *№ 113 at 20.*

[24] *№ 113 at 21.*

[25] *№ 80-1 at12-13.*

[26] *№ 80-1 at 77.*

supervisor. *Kight v. Auto Zone, Inc.*, 494 F.3d 727, 734 (8th Cir. 2007). None of them, except N.S. perhaps, had the number and severity of complaints against him that Dr. Fatemi did. Dr. N.S. was put on probation and terminated, like Fatemi. Both were offered the option of completing their contracts before resigning.[27]

• **UAMS Physicians' Conduct.** Dr. Fatemi    says she was discriminated against during her first week at UAMS because Dr. DeCastro, the chief resident, told her to follow Dr. Gandhi, a PGY-1.[28] Dr. Gandhi was one year her junior in the residency program, but he attended UAMS medical and graduate school and knew his way around the school.[29] The University Defendants believed Dr. Gandhi would be one of the best people in the program to orient Dr. Fatemi to her new surroundings.[30] There is nothing untoward about this belief. Dr. Fatemi does not allege that Dr. Gandhi asked her to do anything demeaning or said anything discriminatory to her. Dr.

_____

[27] *№ 113 at 21.*

[28] *№ 113 at 9-12.*

[29] *Ibid.*

[30] *№ 81-3 at 1-2, ¶5; № 82-1 at 84-85.*

-13-

Fatemi took this brief inversion of hierarchy as an affront to her seniority and interpreted the placement as denigration based on her gender.[31]  But the University Defendants were even-handed here.  Dr. Gandhi also oriented Dr. Tabbosha, a male PGY-3, with similar inexperience at UAMS.  Dr. Tabbosha did not see the junior resident's help as insulting.[32]

After Dr. Fatemi raised her concerns about gender discrimination to the Department, Dr. DeCastro was instructed to have a witness present for any closed-door conversations with Dr. Fatemi.[33]  Dr. Fatemi says this created a hostile environment and revealed that Dr. DeCastro was telling everyone to be wary of her.[34]  There is no support for this accusation in the record.  Simply having someone else present during a contentious or sensitive conversation is not discriminatory or hostile.  Dr. DeCastro also denies telling the other residents about Dr. Fatemi's allegations; he says he only told them to have someone else present for meetings with her.[35]  Dr. Fatemi offers no contrary

---

[31]  № 115 at ¶2; № 113 at 10.

[32]  № 83-2 at 5-6.

[33]  № 82-8 at 17.

[34]  № 113 at 12-13.

[35]  № 82-8 at 26, ll. 102:10-20.

-14-

evidence from anyone on the other side of these conversations.  Dr. Fatemi made no secret of her belief that she was being discriminated against,[36] and she does not point to other residents' knowledge of her allegations as a cause of her termination.

Dr. Fatemi says that program faculty met with her and told her she was not a "team player" after she complained about gender discrimination.[37] The University Defendants deny making this statement—they say the meeting focused generally on how she might improve her performance.[38] Even if her supervising physicians expressed their concern about collaboration to Dr. Fatemi, when taken in context of her well-documented conflicts with coworkers, the statement does not indicate discrimination based on gender. The record shows that Dr. Fatemi frequently failed to work well with others,[39] justifying faculty's concerns about her ability to work in the program's team setting.  Dr. Fatemi claims that she was never given concrete suggestions for

---

[36] № 113 at 12-13.

[37] № 113 at 17.

[38] № 74 at 14.

[39] № 81-3 at 1-4 & 13; № 82-2 at 23. № 80-1 at 1-7.

-15-

improvement.[40] The documentary record shows otherwise.[41] Yet she spurned any critique, seeing these comments only as evidence of discrimination. She cannot have it both ways.

Dr. Fatemi also says that she was put in situations designed for her to fail. First, she says that Dr. McDonnell assigned her to assist in a surgery that was beyond her capability as an inexperienced, second-year resident.[42] Dr. McDonnell, the attending physician for the surgery, and other faculty members testified that this craniotomy was a procedure that should have been familiar to a resident at Dr. Fatemi's level.[43] Dr. Fatemi's subjective belief about the difficulty of the procedure, without more, does not create a genuine dispute of fact. Second, Dr. Fatemi claims her reassignment to the Arkansas Children's Hospital was to add negative documentation to her file because nurses there are known to report residents for any infraction.[44] Dr. Pait says he sent Dr. Fatemi to ACH for a new start, given her interpersonal

---

[40] № 113 at 8; № 81-1 at 8.

[41] № 80-1 at 12-13.

[42] № 81-3 at 7-8.

[43] Ibid.

[44] But see № 83-10; № 83-12 (UAMS nurse reports).

problems at UAMS.[45]   Even assuming ACH nurses report violations of protocol more often than UAMS nurses, Dr. O'Brien's judgment to send Dr. Fatemi back to UAMS only a few days later is understandable, given the record of her behavior there.[46]  Nothing of record indicates that his actions were motivated by gender discrimination.

One ACH nurse reported that Dr. Fatemi left a quarantined patient's room without changing gloves and began to handle patient charts, potentially exposing the entire floor to dangerous pathogens.[47]   Another ACH nurse complained that Dr. Fatemi engaged in an enraged telephone call that alarmed the nurse and nearby patients.[48]  The nurse's report of the incident indicates that, one week into her time at ACH, Dr. Fatemi was yelling and calling the person on the other end of the call a liar, all this near the nurses' station, in earshot of patient rooms.[49]

_____

[45]  № 81-3 at 3, ¶ 16.

[46]  № 81-3 at 17.

[47]  № 83-8 & 83-9.

[48]  № 83-6 & 83-7.

[49]  Ibid.

Dr. Fatemi also repeatedly says that UAMS denied her magnifying loupes—special surgical glasses—because of her gender.[50]   But the uncontradicted evidence shows no resident received loupes from the program either during Dr. Fatemi's time at UAMS or since then.   If any resident obtained loupes through UAMS, it was before Dr. Fatemi's arrival, when the program had money to buy them.[51] Faculty members testified that loupes are not necessary, and some neurosurgeons, including Dr. Day, eschew their use.[52] Dr. Fatemi participated in many surgeries during her time at UAMS, despite not having loupes.[53]  Dr. Fatemi says that Dr. Day once asked her to leave a surgery because she did not have the magnifying glasses.[54]  Dr. Day says he told her to break scrub because she did not know the anatomy relevant to the procedure.[55]  Either way, given the undisputed proof about

_____

[50]  № 79-2 at 26.

[51]  № 80-1 at 112-13.

[52]  *Ibid.*

[53]  № 103-5.

[54]  № 113 at 12 & 43.

[55]  № 80-1 at 17.

UAMS not providing loupes to similarly situated residents, the incident does not support an inference of gender discrimination.

Finally, Dr. Fatemi makes much of the fact that no women had graduated from the neurosurgery program at the time she applied.[56] This is not a smoking gun. No woman, it is true, had yet completed this program at UAMS. The probative force of that fact on the ultimate issue of gender discrimination fades away, however, when considered with the rest of the story. UAMS had consistently asked for female residents through the nationwide matching program. It had received hardly any. Before Dr. Fatemi's time, a woman became chief resident of the neurosurgery residency, a coveted position. She was murdered shortly before she completed her residency.[57] Another woman resident transferred to a residency program in another specialty, though she testified that she was urged to stay in

---

[56] № 113 at 1.

[57] № 83-2 at 4-5.

neurosurgery.[58]   And her declaration is unequivocal: she experienced no
gender discrimination when she was at UAMS.[59]

•       **Untruthful or Shifting Explanations.**   To reach the jury, Dr.
Fatemi must produce "sufficient probative evidence" on which a rational fact
finder could conclude that the University Defendants are lying about the
reason for Fatemi's termination and that the actual reason was sex
discrimination.   *Argenyi*, 703 F.3d at 446.   "[A] substantial change in an
employer's legitimate, nondiscriminatory reason for firing an employee may
be probative of pretext . . . [but] these discrepancies must actually be
substantial."   *Twiggs v. Selig,* 679 F.3d 990,994 (8th Cir. 2012).

Dr. Fatemi says that Dr. Day's reasons for termination "shifted . . . in
step with the level of complaints she was making."[60]  She contends: "UAMS
came up with its assertion that her medical skills were lacking . . . much
later."[61] The record reveals, though, that her supervisors met with her several

---

[58]  *№ 83-3.*

[59]  *Ibid.*

[60]  *№ 113 at 79.*

[61]  *№ 113 at 60.*

times during her four months to discuss performance and behavior problems and documented these meetings in follow-up memos and letters.[62]   It is also undisputed that Dr. Day recorded the reasons for Dr. Fatemi's probation in two letters, the latter containing more detail.[63]   Dr. Fatemi says these additional details were "entirely new and false allegations."[64]   Given the undisputed events in the record, it is difficult to see how the April 10th letter's contents came as a surprise to Dr. Fatemi.   She cannot simply claim the allegations were false; she must produce sufficient probative evidence tending to show that Dr. Day and the other University Defendants lied.   *Argenyi,* 703 F.3d at 446.   Dr. Fatemi has not done so.   The University Defendants say that they amended the letter to assure that Dr. Fatemi received due process and had adequate notice of all the grounds for her probation.[65]   This is not the kind of substantial discrepancy contemplated by *Twiggs.*   Dr. Fatemi exhibited a pattern of behavioral and performance problems that accumulated over time.

---

[62]   *№ 80-1 at 8-9, 15-16; № 81-3 at 12, 15.*

[63]   *№ 80-1 at 8 & 12-13.*

[64]   *№ 113 at 41.*

[65]   *№ 81-2 at ¶11-12.*

-21-

Some new incidents had accrued since her last meeting with her supervisors; and the amended probation letter's contents generally reflected the problems discussed in earlier meetings between Dr. Fatemi and faculty.[66]   Also, Dr. Fatemi was not terminated until six weeks later.[67]  She thus had a month and a half to rectify any misunderstanding and improve her performance.

A reasonable jury could come to only one conclusion on gender discrimination after considering all the undisputed material facts, and considering the few disputed facts in Dr. Fatemi's favor. She lost her place at UAMS because of her many professional shortcomings as a resident, not because she is a woman. *Wallace v. Sparks Health System,* 415 F.3d 853, 860 (8th Cir. 2005).   The University Defendants, therefore, are entitled to summary judgment on Dr. Fatemi's gender-discrimination claims under federal and state law.

**3. Retaliation.** Dr. Fatemi says she has produced direct evidence of the University Defendants' retaliatory motives for termination.[68]  Not so.  Her

_____

[66] № 80-1 at 12-13.

[67] № 80-1 at 78.

[68] № 113 at 80.

evidence does not demonstrate a specific link between her termination and her complaints of gender discrimination. "[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern & Santa Fe Railyway Co. v. White*, 548 U.S. 53, 69 (2006).

Dr. Fatemi relies upon statements made by Dr. Day after he put her on probation for unprofessional behavior and incompetence. UAMS had already conducted a preliminary investigation into her complaints of gender discrimination and determined that her claims were unfounded. Dr. Fatemi insisted that all of her problems at UAMS were due to gender discrimination. Her instructors were, understandably, frustrated that she would not take any personal responsibility for her behavioral problems. Dr. Day noted the negative impact of Dr. Fatemi's litigiousness on his ability to teach her. According to Dr. Fatemi's transcript of a surreptitiously recorded conversation, Dr. Day said to her, "So how easy is it for me or the other faculty to really educate you and train you when we're in you know basically denying, get an attorney, you know demanding an investigation of every little

detail written down on here."[69] This observation is not evidence of retaliation. Read in context, Dr. Day's comment reflects his frustration with Dr. Fatemi's unwillingness to accept responsibility, not an intention to punish her for complaining about gender discrimination.

Dr. Fatemi muddles the timing of her termination to make it look like her lawyer's involvement caused Dr. Day to retaliate and fire her. It is undisputed that he placed Dr. Fatemi on probation in early April.[70] The precise date of her termination is superficially disputed. The University Defendants say that on 25 May 2010 Dr. Day offered Dr. Fatemi the option of resigning by 2 June 2010 and completing her contract, which ended 30 June 2010, or being terminated from the program.[71] Dr. Fatemi says she thought she had been fired on May 25th. Her contemporaneous email to Dr. Dan Kelley says "I just got fired by JD."[72] A series of emails between Dr. Day and

---

[69]  № 80-1 at 25.

[70]  № 80-1 at 12-13.

[71]  № 118 at 33.

[72]  № 84-11 at 1.

-24-

Dr. Fatemi after the May 25th meeting indicates that she later refused to resign, forcing Dr. Day's hand on June 3rd.[73]

Dr. Fatemi's lawyer emailed a letter to Dr. Day on 1 June 2010.[74] When he got the letter, Dr. Day forwarded it to a UAMS attorney, saying, "Fire a missile back."[75] Dr. Fatemi insists that this phrase is direct evidence of unlawful retaliation. But, at the time he wrote this email, Dr. Day had already told Dr. Fatemi that her residency was done, either by termination immediately or by resignation no later than June 2nd, effective at the end of June. Given the facts of record, no reasonable juror could conclude that "fire a missile back" email indicates Dr. Day decided to terminate Dr. Fatemi because of her lawyer's letter. Dr. Day was suggesting a retaliatory letter in strong terms from counsel, not making a retaliatory employment decision contrary to Title VII.

The undisputed evidence shows that Dr. Day officially terminated Dr. Fatemi's residency on June 3rd. He had asked on May 25th for her

---

[73] *Ibid.*

[74] № *84-13.*

[75] № *111-11.*

resignation letter. The matter was decided then. He terminated her residency because he did not receive her resignation letter by the June 2nd deadline, as he said he would, not because her lawyer sent a last-minute letter on June 1st.[76]

Complaints of discriminatory treatment are a protected activity under Title VII and the Arkansas Civil Rights Act. Termination is certainly a materially adverse action. But Dr. Fatemi's subjective belief that she was retaliated against is not enough. *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 976 (8th Cir. 2012). Even if Dr. Fatemi has made a *prima facie* case of retaliation indirectly, her claim fails at the pretext stage. *Brown v. City of Jacksonville*, 711 F.3d 883, 893-94 (8th Cir. 2013). For the many reasons already explained, a reasonable fact-finder could only conclude that Dr. Fatemi's performance problems, not retaliatory animus, drove UAMS's ultimate decision. "Title VII is a shield to protect employees from retaliation for exercising their right to challenge discriminatory treatment by filing EEOC complaints and charges. It is not a cudgel to be wielded by underperforming and unprofessional employees to prevent justified, non-discriminatory

---

[76] № 80-1 at 78.

-26-

employment termination." *Brown*, 711 F.3d at 894.     The University Defendants are entitled to summary judgment on Dr. Fatemi's retaliation claims under federal and state law.

**4. § 1983 Claims.**  Dr. Fatemi also says that the University Defendants violated her rights to due process and equal protection. For various reasons, her constitutional claims fail as a matter of law on the undisputed facts. The legal standards and analysis for discrimination claims brought under Title VII and those brought under § 1983 for violation of the Equal Protection Clause are essentially the same. *Hill v. City of Pine Bluff*, 696 F.3d 709, 712 (8th Cir. 2012). For the same reasons that Dr. Fatemi's discrimination claims fail under Title VII, they also fail under § 1983. The University Defendants are therefore also entitled to qualified immunity here.

•     **Due Process/Property Interest.** Assuming, without deciding, that Dr. Fatemi had a protected property interest in her residency at UAMS, on the undisputed facts she received all of the process she was due under the Constitution. She received notice, an opportunity to respond to the charges before she was terminated, and the opportunity for post-termination administrative review. All this suffices. *Floyd-Gimon v. UAMS*, No. 12-1797,

slip op. at 7 (8th Cir. 18 June 2013); *Young v. City of St. Charles*, 244 F.3d 623,

627 (8th Cir. 2001).

The Court of Appeals has been clear that pre-termination process "need

not be elaborate to satisfy due process." *Christiansen v. West Branch*

*Community School District*, 674 F.3d 927, 936 (8th Cir. 2012). An informal

meeting with a supervisor is sufficient so long as the employee's potential

grounds for termination are discussed. *Heinen v. Brewer*, 171 F.3d 612, 612-13

(8th Cir. 1999); *Post v. Harper*, 980 F.2d 491, 493-94 (8th Cir. 1992); *Riggins v.*

*Bd. of Regents*, 790 F.2d 707, 710 (8th Cir. 1986).

Dr. Pait and Dr. Day both met with Dr. Fatemi several times before her

termination.[77] They discussed her behavioral and performance problems and

directed her to the Employee Assistance Program for counseling.[78] They told

her she would be put on probation if the problems continued.[79] When she did

not improve, Dr. Day placed her on probation and sent her a follow-up letter

documenting her failure to meet minimum behavioral and performance

---

[77] *№ 80-1 at 15-16, 20; № 81-3 at 12 & 15.*

[78] *Ibid.*

[79] *№ 80-1 at 9-10 & 12-13.*

standards.[80]   Shortly thereafter, Dr. Day  sent her another, more detailed letter, clarifying the standards she must meet. Dr. Day discussed termination and resignation options with her after he determined that she had not made significant improvement.

Dr. Fatemi waived the post-termination hearing requirement when she voluntarily declined to participate in the post-termination hearing process. *Birdwell v. Hazelwood School Dist.*, 491 F.2d 490, 495 (8th Cir. 1974).   Her dispute with UAMS over hearing procedures is beside the point because the grievance process satisfied Eighth Circuit post-termination hearing standards. *Riggins*, 790 F.2d at 710.  Contrary to Dr. Fatemi's arguments, the law does not require a post-termination hearing equivalent to a trial. *Ibid.*

• **Due Process/Liberty Interest.** Dr. Fatemi says that UAMS deprived her of a protected liberty interest when the hospital communicated her termination to the American Council of Graduate Medical Education and when Dr. Day telephoned two of Dr. Fatemi's professional references, telling them she was terminated for dishonesty. Putting aside the fact that Dr. Fatemi made the accusation of dishonesty a matter of public record by filing

_____

[80] *Ibid.*

-29-

this lawsuit, the accusation is one that could seriously damage Dr. Fatemi's good name. *Coleman v. Reed*, 147 F.3d 751, 754 (8th Cir. 1998). She was entitled to a name-clearing hearing — an opportunity to respond to the charges against her. She got that opportunity. *Floyd-Gimon*, No. 12-1797, slip op. at *9-11 (8th Cir. 18 June 2013).

Dr. Fatemi met several times with Dr. Day during the course of her probation. Those meetings satisfied UAMS's obligations here. Her failure to formally request a name-clearing hearing, moreover, forecloses her § 1983 claim. *Winskowski v. City of Stephen*, 442 F.3d 1107, 1111 (8th Cir. 2006), *cert. denied* 549 U.S. 975 (2006). Not only did Dr. Fatemi not request this kind of hearing, she pulled out of UAMS's established post-termination grievance procedures, opting to sue instead. UAMS provided Dr. Fatemi all the process she was due in the circumstances. *Floyd-Gimon*, No. 12-1797, slip op. at *7 (8th Cir. 18 June 2013); *Satcher v. University of Arkansas at Pine Bluff Board of Trustees*, 558 F.3d 731, 736 (8th Cir. 2009).

UAMS provided Dr. Fatemi due process before it fired her and offered to provide more process after, an offer she declined. The Constitution requires no more. Whether considered as a matter of a property interest or a

-30-

liberty interest, her constitutional claims fail on the merits.  At a minimum, the University Defendants are entitled to qualified immunity in their individual capacities.  The University Defendants are therefore entitled to summary judgment on her § 1983 claims.

**5. Remaining State Law Claims.** Dr. Fatemi's remaining claims allege violations of Arkansas law that do not present federal questions. This Court will therefore not exercise its jurisdiction further.   28 U.S.C. § 1367(c)(3); *Williams v. Hobbs*, 658 F.3d 842, 853 (8th Cir. 2011).  Dr. Fatemi's claims of defamation and tortious interference with a reasonable business expectancy are dismissed without prejudice.

\*       \*       \*

The University Defendants' motion for summary judgment[80] is granted. Dr. Fatemi's complaint is dismissed with prejudice as to her claims of unlawful gender discrimination and retaliation under Title VII, along with the echoing state law claims under the Arkansas Civil Rights Act.  Her due-process and equal-protection claims are also dismissed with prejudice.  The

---

[80] № 73.

-31-

Court declines to exercise jurisdiction over her defamation and tortious-interference claims; they are dismissed without prejudice. The motions in limine,[81] the University Defendants' motion for partial summary judgment on the after-acquired evidence issue,[82] and the latest motion to strike[83] are all denied as moot.

So Ordered.

D.P. Marshall Jr.
United States District Judge

20 June 2013

---

[81]  № 151, 153, 155, 157, 159, 161, 163, 165, 167, 169, 171, 173, 175, 177 & 179.

[82]  № 127.

[83]  № 182.